UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Caleb Souliere, on behalf of
Aime R. Souliere, deceased,

      Plaintiff,

      v.                                      Civil No. 2:13-cv-236-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

**OPINION AND ORDER**
(Docs. 11, 14)

Plaintiff Caleb Souliere, Administrator of the Estate of Aime R. Souliere ("Souliere"), deceased, brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying, in part, Souliere's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner determined that Souliere was disabled as of December 19, 2010, but not before that date. Souliere died on October 10, 2013, while this matter was pending. (Doc. 23-1.) On November 20, 2014, Souliere's son Caleb filed a motion requesting that he be substituted as Plaintiff, given that he is the only surviving son of Souliere and the administrator of Souliere's estate. (Docs. 23, 23-2.) The motion was granted, and Caleb was substituted as Plaintiff in this action on November 24, 2014. (Doc. 24.)

Pending before the Court are Souliere's motion to reverse the Commissioner's decision (Doc. 11), and the Commissioner's motion to affirm the same (Doc. 14). For the reasons stated below, the Court GRANTS Plaintiff's motion, DENIES the Commissioner's motion, and REMANDS for further proceedings and a new decision.

## Background

Souliere was 52 years old on his alleged disability onset date of June 17, 2008. He had a limited education, completing only 11 years of schooling. His past work included jobs as a meat cutter/butcher, a cook, a salesman, a painter, and a shipping and receiving worker. During most of the alleged disability period, he was homeless, sleeping on friends' couches. (AR 60–61.)

In June 2005, Souliere was admitted to the hospital and found to have rapid atrial fibrillation. (AR 434.) In the same month, he was also found to have congestive heart failure. (AR 426.) Thereafter, Souliere treated with internist Dr. Christopher Rickman for both his atrial fibrillation and congestive heart failure, among other things. (*See, e.g.*, AR 408.) In February 2009, Dr. Rickman stated that a Holter Monitor Report indicated Souliere had "[c]hronic atrial fibrillation with occasional ventricular ectopy." (AR 573.) Souliere also had an alcohol problem, and in March 2009, cardiologist Dr. Andrew Torkelson stated that Souliere's cardiomyopathy was "related to probably alcohol and A-fib." (AR 567.) Dr. Torkelson stated that Souliere was at risk of ischemic heart disease, given his family history, and advised Souliere to avoid alcohol and tobacco. (AR 568.) Approximately one year later, in March 2010, Dr. Torkelson noted that Souliere was under a lot of stress related to having his license revoked due to two DUI convictions,

living on unemployment benefits and food stamps, and gaining weight "dramatically." (AR 688.) Dr. Torkelson recommended that Souliere focus on weight loss and low-level exercise, as well as smoking cessation. (AR 689.)

At his administrative hearings in November 2010 and November 2011, respectively, Souliere testified that his ability to function was limited because he had minimal strength and became winded easily when bending over, taking walks, and carrying groceries, requiring him to sit down frequently to rest. (AR 34, 45, 63.) On a typical day in November 2010, Souliere went for a 1.5- to 2.5-hour walk, watched television, swept the floor (despite getting winded), and visited neighbors. (AR 35.) By November 2011, Souliere could walk for only about 25% of the time he could walk one year earlier, and he had to go at a much slower pace and take more frequent breaks to catch his breath. (AR 63, 66–67.)

In February 2009, Souliere protectively filed applications for DIB and SSI. Therein, he alleged that, since June 24, 2005,[1] he was unable to work because of his atrial fibrillation. He stated: "I can't work like I used to. I get short[-]winded and I have to go slower." (AR 319.) More recently, he stated that he felt weak and fatigued, was losing weight, and had little appetite. (AR 365, 368, 382.) His applications were denied initially and upon reconsideration, and he timely requested an administrative hearing. On November 15, 2010, Administrative Law Judge ("ALJ") Thomas Merrill conducted the first hearing on Souliere's applications. (AR 30–54.) Souliere appeared and testified,

---

[1] At the first administrative hearing, Souliere amended his alleged disability onset date to June 17, 2008. (AR 34, 93; *see also* AR 390.)

and was represented by counsel. On December 2, 2010, the ALJ issued a decision finding that Souliere was not disabled under the Social Security Act from his alleged disability onset date through the date of the decision. (AR 90–108.) Approximately three months later, the Decision Review Board ("DRB") remanded the case back to the ALJ for resolution of several issues. (AR 109–13.) Accordingly, on November 14, 2011, the ALJ held a second hearing at which Souliere, represented by counsel, again appeared and testified. (AR 55–83.) A vocational expert and a medical advisor also testified at the hearing. (*Id.*) On December 9, 2011, the ALJ issued a new decision finding that Souliere was disabled beginning on December 19, 2010, but not earlier. (AR 9–28.) Soon thereafter, the Appeals Council denied Souliere's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–6, 401.) Having exhausted his administrative remedies, Souliere filed the Complaint in this action on September 3, 2013. (Doc. 3.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

4

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, in his most recent December 2011 decision, ALJ Merrill first determined that Souliere had not engaged in substantial gainful activity since his alleged disability onset date.  (AR 15.)  At step two, the ALJ found that Souliere had the severe impairments of cardiomyopathy with atrial fibrillation, congestive heart failure, and obesity.  (*Id.*)  Conversely, the ALJ found that Souliere's hypertension,

5

hyperlipidemia, chronic obstructive pulmonary disease, osteoarthritis, and major depressive disorder, were nonsevere. (AR 16.) At step three, the ALJ determined that none of Souliere's impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.*)

Next, the ALJ determined that Souliere had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), except that he must "avoid exposure to hazards that would expose him to lacerations or blunt force trauma." (AR 16.) Given this RFC, the ALJ found that Souliere was unable to perform his past relevant work as a meat cutter, a cook, and a shipping and receiving worker. (AR 20.) Based on vocational expert testimony, however, the ALJ determined that, prior to December 19, 2010, the date Souliere's age category changed, there were other jobs existing in significant numbers in the national economy that Souliere could perform, including the jobs of mail sorter, order caller, and assembler. (AR 21–22.) The ALJ concluded that Souliere "was not disabled prior to December 19, 2010, but became disabled on that date and . . . continued to be disabled through the date of this decision." (AR 22.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

6

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Souliere argues that the ALJ erred by mechanically applying the Medical Vocational Rules, *see* 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids"), at step five of the sequential analysis, and by failing to consider whether Souliere was disabled

7

during the six-month period prior to his 55th birthday. Souliere further asserts that the ALJ erred in his analysis of the medical opinions, particularly those of examining occupational therapist, Mark Coleman, and treating internist, Dr. Rickman. Finally, Souliere claims that the ALJ's RFC determination is not supported by substantial evidence, and that the record supports a finding that Souliere was unable to perform light work activity during the relevant period. In response, the Commissioner asserts that the ALJ's decision should be affirmed because it is supported by substantial evidence and complies with the applicable legal standards.

## I.    Borderline Age Situation

On December 19, 2010—approximately one month after the first administrative hearing and one year before the ALJ's most recent decision—Souliere's age category changed from "closely approaching advanced age" to "advanced age."[2] (AR 21.) Mechanically applying the Grids, the ALJ found that, *as of that date*, Souliere was no longer "able to transfer job skills to other occupations" (*id.*), leaving him unable to work under Medical-Vocational Rule 202.02 (AR 22). For the period prior to that date, however, the ALJ found that Souliere was able to work. (*Id.*) As explained below, the Court finds that the ALJ erred in failing to analyze whether a borderline age situation existed for the six-month period prior to December 19, 2010.

The classifications in the Grids divide claimants into specific categories according to age, transferability of skills, and RFC. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. The

---

[2] Although Souliere's 55th birthday was on December *20*, 2010, his age category changed on December *19*, 2010 because the regulations provide that "[a]n individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age." 20 C.F.R. § 404.2(c)(4).

Grids provide three distinct age categories: (1) under age 50 ("younger person"); (2) age 50–54 ("[p]erson closely approaching advanced age"); and (3) age 55 or older ("[p]erson of advanced age"). 20 C.F.R. § 404.1563(c)–(e). The regulations explain how these categories are to be applied in a borderline age situation, *i.e.*, when a claimant's age overlaps between categories, and state that the Commissioner "will not apply the age categories mechanically in a borderline situation." *Id.* at § 404.1563(b). The regulations explain: "If [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." *Id.*

Here, the ALJ did not consider using the "advanced age" category for the period before Souliere's 55th birthday. Not only did this failure contravene the plain meaning of the regulatory guidelines stated above, it also disregarded the DRB's March 2011 order directing the ALJ to "[f]urther consider[]" the borderline age situation (AR 111) pursuant to the applicable regulations and administrative guidelines (AR 112). The Commissioner concedes that the ALJ "never considered the borderline age issue in [this] case," but argues that he was not required to because, by the time the ALJ issued his second decision, Souliere was 55 years old and thus had already moved into the advanced age category, making the borderline age issue moot. (Doc. 14 at 14.) The Commissioner cites to several cases from districts in other circuits which hold that where, as here, the claimant reaches a higher age category *during the adjudicated period*, and the Grids direct a finding of disability under that category, there is no need to consider the

9

borderline age issue. (*Id*. at 15–18.) The Court is not persuaded by these cases, which provide no convincing rationale or legal authority for their decisions on this particular point. *See, e.g.*, *Thibodeau v. Astrue*, No. 8:07–cv–2060–T–27TBM, 2009 WL 585888, at *4-6 (M.D. Fla. Mar. 6, 2009); *Williams v. Comm'r of Soc. Sec. Admin.*, No. 07–3234 (SRC), 2008 WL 5075549, at *11–12 (D. N.J. Nov. 25, 2008); *Davis v. Sec'y of Health and Human Servs.*, 634 F. Supp. 174, 181–82 (E.D. Mich. Apr. 22, 1986). Moreover, the Court notes (and the Commissioner concedes (*see* Doc. 14 at 19))[3] that there are as many cases finding to the contrary, *see, e.g.*, *Peevy v. Colvin*, Civil No. 12–2043, 2013 WL 610360, at *4 (W.D. Ark. Feb. 19, 2013); *Aldridge v. Astrue*, 880 F. Supp. 2d 695, 701 (E.D.N.C. 2012); *Allen v. Comm'r of Soc. Sec.*, Civil Action No. 10–cv–2614 (JLL), 2011 WL 1321985, at *12 (D. N.J. Mar. 30, 2011), including a case from this Court, *see* Doc. 17-2 at 9 (Opinion and Order in *Duval v. Barnhart*, Civil No. 2:05-CV-254-jjn (D. Vt. June 23, 2006) ("the Commissioner should make a determination whether to apply the borderline regulation to [the claimant] for any period prior to his reaching age 50")).

As Souliere argues, the plain meaning of the applicable regulation requires the ALJ to consider the borderline age situation in cases like this, regardless of whether the claimant actually reaches the older age category during the relevant period. *See* 20 C.F.R. § 404.1563(b) ("If you are within a few days to a few months of reaching an older age category . . . , we will consider whether to use the older age category"). Furthermore, in this case, the DRB remanded the case to the ALJ with explicit orders to consider the

---

[3] The Court commends counsel for the Commissioner for noting these divergent cases. (*See id.*)

borderline age issue, despite knowing at the time that Souliere was already 55 years old and thus had already reached the "advanced age" category under the Grids.

The ALJ's failure to consider the borderline age situation was not harmless error because the medical and vocational factors favor placing Souliere in the "advanced age" category for the six-month period prior to Souliere's 55th birthday. Although the regulations do not clearly define the outer limits of a borderline age situation, this Court and others have held that six months is within the rule. *See* Doc. 17-2 at 10 (Opinion and Order in *Duval*, Civil No. 2:05-CV-254-jjn ("this Court suggests that the period should be no more than six months from the next higher age category")); *Metaxotos v. Barnhart*, No. 04 Civ. 3006(RWS), 2005 WL 2899851, at *8 (S.D.N.Y. Nov. 3, 2005) (citing *Cox v. Apfel*, No. 98-7039, 1998 WL 864118, at *4 (10th Cir. Dec. 14, 1998) (because plaintiff was within six months of next age category at time decision issued, ALJ erred by not addressing whether plaintiff was of borderline age); *Smith v. Barnhart*, No. 00 Civ. 2643, 2002 WL 126107, at 2–4 (N.D. Ill. Jan. 31, 2002) (noting that the cases tend to treat claimants who are within six months of next age category as borderline); *Roush v. Heckler*, 632 F. Supp. 710, 711–12 (S.D. Ohio 1984) (six months borderline)).

Souliere was approximately one month shy of his 55th birthday on the date of the first administrative hearing, and just short of his 56th birthday when the ALJ rendered the partially favorable decision at issue herein. Under Rules 202.02 and 202.06 of the Grids, a finding of "disability" is mandated for an individual who is at least 55 years old, who has a limited education or a high school education, who has no transferable work skills, and who is limited to a full range of light work activity. 20 C.F.R. pt. 404, subpt. P, app.

2, §§ 202.02, 202.06.[4]  Pursuant to the ALJ's RFC determination, Souliere was limited to less than a full range of light work, the ALJ stating that he needed to "avoid exposure to hazards that would expose him to lacerations or blunt force trauma."  (AR 16.)  Moreover, Souliere had a limited education, completing only 11 years of schooling.  Furthermore, by finding that Rule 202.02 applied to Souliere once he turned 55 years old, the ALJ determined that the skills Souliere gained from his previous work experience were "not transferable."  Therefore, the facts support application of Rule 202.02 prior to Souliere's attainment of age 55, and the Court remands for consideration of the borderline age situation.

## II.     Analysis of Medical Opinions

The Court also remands for a new analysis of the medical opinions.  As explained below, the ALJ should have given more weight to the opinions of examining occupational therapist Coleman and treating internist Dr. Rickman.

In November 2010, Coleman conducted a four-hour examination of Souliere, including administering a number of tests which showed that Souliere had a marked increase in his heart rate while performing several exertional activities.  (AR 722–23.)  Coleman prepared a Functional Capacity Evaluation ("FCE") based on this examination, and concluded that Souliere had the work capacity for only sedentary to light work with a lifting capacity limited to 15 pounds.  (*Id.*)  Noting that Souliere's atrial fibrillation appeared to be affecting the heart rate monitor readings, and having to stop testing on

---

[4] If the individual is limited to a full range of sedentary work activity, the applicable Grid Rules are 201.02 and 201.06.

12

three occasions due to irregular heart rate readings,[5] Coleman found that Souliere "would not function well in work that challenged him aerobically." (AR 722.) Given that Souliere's heart rate was "the main health concern," Coleman recommended that "the Primary Care Physician or Cardiologist review [the FCE's] findings and make any recommendations they feel appropriate." (AR 723.)

The ALJ gave "little weight" to Coleman's FCE because: (1) Coleman stated in the FCE that Souliere gave variable effort on grip strength testing; (2) the FCE states that a cardiologist should review the report and make recommendations, and medical advisor Dr. Joseph Gaeta, a cardiologist who testified at the second administrative hearing, "did just that"; (3) Dr. Gaeta testified that some of Souliere's heart rate readings recorded in the FCE were "not reasonable"; and (4) Coleman is not an "acceptable medical source." (AR 19–20.) These are not adequate grounds for giving limited weight to the FCE.

First, despite Coleman's statement in the FCE that Souliere's "grip strength testing suggested he did not give his best effort," Coleman found that, overall, Souliere's consistency of effort was "fairly good," stating that there was "[g]ood consistency" with motions measured during the physical examination and those seen during functional testing; that "[m]ovement patterns were consistent throughout the evaluation and consistent with [Souliere's] diagnosis"; and that "[s]ubjective reports on the functional pain scale were consistent with [Souliere's] functional presentation." (AR 723.) The ALJ should not have cherry-picked from the FCE one finding that Souliere gave less than

---

[5] The FCE states: "Precautions relating to [Souliere's] irregular heart rate were the primary limiting factor today as seen by this therapist needing to stop Mr. Souliere on 3 occasions. [Souliere] was stopped because of high and irregular heart rate readings despite being on a beta blocker." (AR 723.)

13

his best effort while ignoring multiple findings that Souliere expended good effort. While ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence that supports a particular conclusion. *See Fiorello v. Heckler*, 725 F. 2d 174, 175 (2d Cir. 1983). Moreover, Coleman based his opinion that Souliere was limited to a sedentary to light work capacity (15 pounds) on Souliere's MET (metabolic) rate of 2.0, not on his grip strength. (AR 721–22.)

Second, the ALJ's reasoning that the FCE warranted little weight because Coleman recommended therein that Souliere's primary care physician or cardiologist should "review th[e] report's findings and make any recommendations they feel appropriate" (AR 723), is misguided. A plain reading of the FCE reveals that Coleman made that statement in consideration of Souliere's heart condition and out of concern for Souliere's heart health, not because of any insecurities he had about the findings he made in the report. Coleman explicitly stated that a physician should review the FCE's findings and make recommendations "*[d]ue to the heart rate being the main health concern.*" (*Id.* (emphasis added).) He also recommended that Souliere obtain "[c]learance from his cardiologist or primary care physician" before performing any work tasks above the sedentary to light level. (AR 722.) It is clear that Coleman suggested a physician review his FCE findings for diagnostic/treatment purposes, not for validation of his opinions.

Next, the ALJ erred in his findings regarding Dr. Gaeta's testimony at the administrative hearing, and it appears that both the ALJ and Dr. Gaeta may have misunderstood Coleman's findings in the FCE. The ALJ stated Dr. Gaeta testified that

14

Coleman's recording that Souliere's heart rate reached 165 was "not reasonable and would never have escalated that high." (AR 20.) A review of Dr. Gaeta's testimony reveals that he misunderstood Coleman's FCE, believing that the high heart rate recording was found while Souliere was just sitting. (*See* AR 78 ("people don't walk around with heart rates of 165 and [Souliere] was just sitting there, I guess, when he . . . did this").) In fact, Souliere wore a heart monitor throughout the duration of his four-hour evaluation with Coleman, and his heart rate reached 165 at some point during the testing, presumably during the exertional functional testing. (*See* AR 722 ("Souliere wore a heart rate monitor. Readings were seen as high as 165 bpm[.]"); *see also* AR 724–25 ("Physical Capacities Table," listing various physical activities performed during testing).) Moreover, Coleman noted in the FCE that "[m]arked increases were seen in [Souliere's] heart rate *during stair climbing, repetitive bending[,] and to a lesser degree ladder climbing*." (AR 722 (emphasis added).) Further, Coleman's high heart rate reading is consistent with the recordings of other medical providers at different times; for example, heart rate readings of 138, 144, 160, and 191, are also documented in the record. (*See* AR 434, 601, 663, 825.) These recordings indicate that Souliere did have extremely high heart rate readings at times, despite Dr. Gaeta's and the ALJ's disbelief.

Lastly, the ALJ discredited Coleman's findings on the grounds that Coleman is not an "acceptable medical source." But despite Coleman's status as an occupational therapist and not a physician or psychologist, the ALJ was still required to provide a reasonable explanation for his decision to afford limited weight to his opinions. *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). SSR 06-03p

states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources," including therapists, to show the severity of a claimant's impairments and how they affect his or her ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). The Ruling further states that medical sources like therapists "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. Thus, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* SSR 06-03p directs ALJs to apply the following factors in evaluating opinion evidence from "other sources," including therapists: (1) whether the source is a specialist or an expert in the area related to the claimant's impairment; (2) how long the source has known and how frequently the source has seen the claimant; (3) whether the source explains and presents relevant evidence to support his or her opinion; (4) how consistent the source's opinion is with other evidence; and (5) any other factors tending to support or refute the opinion. *Id.* at *4–5.

The ALJ should have considered three key factors in assessing Coleman's opinions: (1) although Coleman did not have a treating relationship with Souliere, he did conduct an extensive and lengthy examination of Souliere, unlike nonexamining agency consultants Drs. Leslie Abramson and Geoffrey Knisely and unlike medical advisor Dr. Gaeta, whose opinions the ALJ gave "great weight" (AR 18–19); (2) Coleman's opinions are supported by his examination results and consistent with the record as a whole, including the opinions of treating physician Dr. Rickman; and (3) Coleman's area of

specialty is conducting functional evaluations and forming opinions based on their results. In sum, the ALJ failed to give good reasons for affording little weight to the comprehensive FCE of Coleman, an experienced occupational therapist.

The ALJ's analysis of Coleman's FCS is particularly deficient, given that Souliere's treating physician, Dr. Rickman, fully supported Coleman's findings. (AR 898.) Dr. Rickman stated in an October 2011 Questionnaire that he had reviewed Coleman's FCE and agreed with the findings contained therein. (*Id.*) Thus, Dr. Rickman opined that, since June 2005, Souliere was limited to a sedentary to light work capacity with a maximum lifting capacity of 15 pounds. (*Id.*)

Given that Dr. Rickman was Souliere's treating physician, his opinions were entitled to extra weight. Under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Where, as here, an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so. *Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998). Even when a treating physician's opinions are not given controlling weight, the regulations require the ALJ to consider several factors—including the length of the treatment relationship, the frequency of examination, and whether the physician is a specialist in the area covering the particular medical issues—in determining how much weight they should receive. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

The ALJ here gave "little weight" to Dr. Rickman's opinions on the grounds that they are "based on [a FCE] whose validity is also questionable. Further, Dr. Rickman is not a cardiologist and does not hold any specialized training in conditions of the heart as does Dr. Gaeta." (AR 20.) These are not "good reasons" for affording little weight to Dr. Rickman's opinions. As discussed above, the ALJ's rationale for questioning the validity of Coleman's FCE is not supported by substantial evidence. Moreover, although it is true that Dr. Rickman is not a cardiologist and Dr. Gaeta is, it is at least as relevant that Dr. Gaeta never met with Souliere, whereas Dr. Rickman had an extensive treatment relationship with him. Furthermore, Dr. Rickman's opinions are supported by his treatment notes as well as the treatment notes of other treating medical providers (*see, e.g.*, AR 403, 419, 433–34, 564, 567, 587, 597, 601, 616, 623, 628, 633, 635, 639, 722–24, 825–26), a critical factor that the ALJ failed to recognize.

Finally, Souliere argues that the ALJ should have recontacted either Coleman or Dr. Rickman for clarification of their opinions, especially given that the applicable DRB order states that the ALJ "may request the treating and examining sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what [Souliere] can still do despite the impairments." (AR 112.) The Court disagrees that the ALJ was required to recontact Coleman or Dr. Rickman. The ALJ has considerable discretion under the regulations in determining whether to recontact the claimant's medical providers for clarification of their opinions or additional evidence. *See* 20 C.F.R. § 416.920b(c)(1). Social Security Ruling 96-5p provides that the ALJ is required to recontact medical sources only when "the evidence does not

support a treating source's opinion . . . and the [ALJ] cannot ascertain the basis of the opinion from the case record." SSR 96-5p, 1996 WL 374183, at *6 (1996). The Second Circuit explained that, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). Here, Souliere has demonstrated no obvious gap or other deficiency in the evidence. Thus the Court leaves it to the ALJ to determine on remand whether to recontact either Coleman or Dr. Rickman.

## III. RFC Determination

Given the above errors, the ALJ's RFC determination is not supported by substantial evidence. After reweighing the medical opinions on remand, the ALJ should make a new RFC determination.

## Conclusion

For these reasons, the Court GRANTS Plaintiff's motion (Doc. 11), DENIES the Commissioner's motion (Doc. 14), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 7th day of January, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge